56 F.3d 63
 1995 O.S.H.D. (CCH) P 30,791
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Garry WILLIAMS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
J & T COAL, INCORPORATED, Defendant-Appellant.
 Nos. 93-5435, 93-5830.
 United States Court of Appeals, Fourth Circuit.
 Argued April 4, 1995.
Decided May 30, 1995.
 
 ARGUED: Frank Kenneth Friedman, Woods, Rogers & Hazlegrove, Roanoke, VA, for appellant J & T Coal; William Elbert Bradshaw, Bradshaw & Bradshaw, Big Stone Gap, VA, for appellant Williams. Richard Albert Lloret, Assistant United States Attorney, Abingdon, VA; Stephen Urban Baer, Assistant United States Attorney, Charlottesville, VA, for appellee. ON BRIEF: M. Caldwell Butler, Sr., Clark H. Worthy, Woods, Rogers & Hazlegrove, Roanoke, VA, for appellant J & T Coal; Birg E. Sergeant, Law Offices of Birg E. Sergeant, Pennington Gap, VA, for appellant Williams. Robert P. Crouch, Jr., United States Attorney, Charlottesville, VA, for appellee.
 Before WIDENER and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 This appeal arises from the conviction of J & T Coal, Inc. (J & T) on six counts of willful violation of Title 30, U.S.C. Sec. 820(d) and Title 30, Code of Federal Regulations, Sec. 75.202(b). The prosecution resulted from a massive roof fall in J & T Coal Mine No. 1 on February 13, 1991 that caused the deaths of four miners, and the claim that J & T and its mine superintendent, Garry Williams, had knowingly violated various mandatory safety and health standards.
 
 
 2
 Prior to the criminal trial, the Federal Mines Safety and Health Review Commission (FMSHRC) assessed $300,000 in civil sanctions against J & T pursuant to 30 U.S.C. Sec. 820(a). Shortly thereafter, an administrative law judge entered a default judgment against J & T in the amount of $300,166, which was not paid. This resulted in an action by the United States Attorney for the Western District of Virginia to collect the judgment, but the civil fine is still unpaid.
 
 
 3
 When J & T and Garry Williams were indicted, Williams entered into a plea agreement with the United States in which he pled guilty to three counts and agreed to testify for the prosecution. J & T moved to dismiss the indictment claiming that because the government had imposed the civil penalties provided by 30 U.S.C. Sec. 820(a) and was now seeking the criminal fines provided by 30 U.S.C. Sec. 820(d), it was being put in jeopardy twice for the same act. This motion was denied, and at trial J & T was found guilty on all six counts and was fined $1,400,000.[1] Shortly thereafter, J & T filed for protection under Chapter VII of the Bankruptcy Act.
 
 
 4
 Williams appeals only the district court's failure to group his offenses under the Sentencing Guidelines and argues that this failure inappropriately increased his offense level.
 
 
 5
 J & T appeals the district court's denial of its double jeopardy claim. It also asserts that the district court committed error at sentencing by failing to group its offenses and by failing to make necessary findings of fact mandated by Federal Rule of Criminal Procedure 32(c)(1), 18 U.S.C. Sec. 3572, and the Sentencing Guidelines as to J & T's ability to pay the fines, as to the financial interconnection between J & T and an affiliated corporation, JAD, to support the court's ruling that it could consider JAD's finances in arriving at J & T's fine, and as to J & T's alleged prior criminal conduct. J & T also claims that the court misapplied the Sentencing Guidelines in setting its fine.
 
 
 6
 We find no error and affirm the convictions and the sentences.
 
 I.
 
 7
 The cause of this mining tragedy is not in dispute. It resulted from the knowing and willful infraction over a course of several days of established safety standards in mining in violation of the Mines Roof Control Plan. These violations resulted in a massive roof collapse and the deaths of four miners. Immediately following the collapse, an extensive and expensive rescue effort was made. A thorough investigation ensued. An estimate of the cost to the government of the rescue effort, the investigation, the civil compliance procedure, and legal fees exceeds $163,000.
 
 
 8
 The association between JAD and J & T as to finances and control does not appear to be unusual in the coal mining business. J & T is a Virginia corporation with no real assets. It was incorporated in 1980 for the purposes of mining, producing, and selling coal. It was capitalized at $1,000, and after ten years of mining, its retained earnings were $664.00. J & T leased all of its equipment from JAD and sold all of its coal to JAD, but J & T's books reflected no lease expenses, no general administrative expenses, and no evidence of accounts payable or receivable between the two corporations. JAD gave J & T money when JAD felt it was necessary. JAD is a Virginia corporation and both J & T and JAD are owned by the same two individuals. JAD maintained several other subsidiary companies similar to J & T. Garry Williams worked for JAD as either a miner or a superintendent from 1982 through November 1992. At times Garry Williams operated his own coal company, Swift Coal, but while doing so, he remained employed by JAD.
 
 II.
 
 9
 Double jeopardy raises a legal issue of constitutional dimensions, and we review questions of law de novo. United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989). "No person shall ... be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Const. amend. V. This protection has been extended to imprisonment and monetary penalties. See United States v. Halper, 490 U.S. 435 (1989). "[T]he double jeopardy clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." Id. at 440.
 
 
 10
 J & T argues that because the $300,000 civil fine imposed by the FMSHRC punished it for violation of the mining regulations, and the violation of the same mining regulations was the basis of the criminal fine imposed by the district court, the large fines imposed in separate and successive proceedings punished it twice for the same offense and violated its Fifth Amendment protection against double jeopardy. The first amount was imposed pursuant to 30 U.S.C. Sec. 820(a), which covers civil penalties for violation of the mandatory health or safety standards. The second and larger amount was imposed under Sec. 820(d) which provides criminal penalties for the willful violation of the same mandatory health or safety standards covering mining operations. J & T contends that both fines were punitive in nature and, therefore, the second fine was punishment for the same act.
 
 
 11
 The government contends that under United States v. Dixon, --- U.S. ----, 113 S.Ct. 2849 (1993), which readopted the "same elements" test of Blockburger v. United States, 284 U.S. 299 (1932), it was required to prove the additional element of a willful violation of the mandatory health or safety rules to secure a conviction under Sec. 820(d) and, therefore, the criminal prosecution is not subject to the double jeopardy bar. This contention is correct. The elements of the offenses described in the two sections are not the same. Section 820(a),[2] which establishes civil penalties, requires only proof of a violation of the health or safety standards by a preponderance of the evidence, but Sec. 820(d),[3] the criminal penalty section, requires proof beyond a reasonable doubt of a willful violation or refusal to comply with the same standards.
 
 
 12
 J & T seeks solace from certain language in Austin v. United States, --- U.S. ----, 113 S.Ct. 2801 (1993), but Austin is an Eighth Amendment Excessive Fines clause case involving a forfeiture of a home and business under 21 U.S.C. Secs. 881(a)(4) and (a)(7) by way of summary judgment after the owner had entered a plea of guilty to possession of cocaine with intent to distribute. We find it inapplicable to the present facts.
 
 
 13
 J & T argues that the civil fine was punishment, as was the criminal fine, and that in United States v. Halper, supra, the court found that such civil punishment, when coupled with a criminal fine, violated the double jeopardy clause.
 
 
 14
 Halper was the manager of a company that provided medical services for Medicare patients. He was convicted of submitting 65 false claims for government reimbursement in violation of the Federal False-Claims statute, 18 U.S.C. Sec. 287. He was imprisoned and fined $5,000. Then the district court granted summary judgment against him in the government's action brought under the Civil False Claims Act, 31 U.S.C. Secs. 3729-3751, which would make him liable for $2,000 on each of the 65 counts, plus twice the amount of the government's actual damages of $585, and the cost of the action. The court held that the statutory penalty authorized by the act as applied to Halper violated the double jeopardy clause, but it pointed out that this was the rare case where a "small gauge offender" had sustained a criminal penalty, and the government thereafter sought a civil penalty that had no rational relation to the purpose of compensating the government for its loss. Therefore, it appeared to be an additional penalty thus crossing the line between a permissible remedy and a prohibited punishment. In Halper, the court did not overrule Helvering v. Mitchell, 303 U.S. 148 (1956) which held that a criminal and a civil sanction may be imposed by the government with respect to the same act and that a remedial sanction did not violate double jeopardy. Whether a given sanction is criminal is a matter of statutory construction. However, the court determined in Halper that "a civil sanction, in application, may be so divorced from any remedial goal that it constitutes 'punishment' for the purposes of double jeopardy analysis." Id. at 443.
 
 
 15
 In Halper, the civil proceeding followed the criminal proceeding, while in the present case the criminal proceeding was subsequent to the civil proceeding. We find the order of the proceedings of no consequence.
 
 
 16
 Halper also held that in determining whether a subsequent sanction violates double jeopardy "the label 'criminal' and 'civil' are not of paramount importance."
 
 
 17
 The determination of whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied to the individual case serves the goals of punishment.
 
 
 18
 Halper at 448. The court went on to find that the determination of a precise dollar figure at which a civil sanction accomplished its remedial purpose of making the government whole involved an element of "rough justice" but added "we have recognized that in the ordinary case fixed-penalty-plus-double-damages provisions can be said to do no more than make the government whole." Id. at 449.
 
 
 19
 In the present case, there seems to be no dispute that the government's costs were in excess of $160,000, which would make the civil sanction of $300,166 safely within the double damages provision approved in Halper. J & T cannot be compared to "small-gauge offender" Halper. Halper involved 65 false claims for medical services totaling less than $600 while the present case involves the violation of safety standards that resulted in the deaths of four miners and $160,000 in expenses to the government. The civil penalty assessed against J & T was reasonable and remedial. Under the present facts, it did not cross the line into the forbidden area of punishment.
 
 
 20
 Halper directs that whether a sanction is criminal is a matter of statutory construction. It is obvious from the language of Sec. 828(a) that Congress intended the penalties imposed thereunder to be civil. The statute is so labeled, and a violation of the safety and health rules under this section does not require a finding of scienter. Violations of the section are assessed regardless of fault and have the obvious purpose of protecting the health and safety of miners. We agree with the Sixth Circuit in United States v. WRW Corporation, 986 F.2d 138, 141-142 (6th Cir.1993): "[W]e conclude that imposing a civil penalty for health and safety violations which varies in amount based upon the severity of the violation and the operator's attempts to come into immediate compliance may as readily be ascribed to the remedial purpose of promoting mine safety."
 
 
 21
 In United States v. One Assortment of 89 Firearms, 465 U.S. 354 (1984), the Court held that unless the purpose or effect of the civil penalty is shown clearly to be punitive, courts will not "override Congress' manifest preference for a civil sanction." Id. at 365. We have concluded that the intent of Congress on this issue is plain and unambiguous. The penalty is remedial in nature, and there is no violation of the double jeopardy clause.
 
 III.
 
 22
 Both appellants contend that the district court erred in considering their offenses as analogous to four separate cases of involuntary manslaughter, because there was no guideline expressly applicable to the violation of 30 U.S.C. Sec. 820(d). They claim they were only guilty of misdemeanors, while involuntary manslaughter is a felony. They also assert that their offenses should have been grouped for purposes of sentencing under Sentencing Guideline Sec. 3D1.2, because the counts involved "substantially the same harm."
 
 
 23
 The district judge was very careful and correct in his analysis of the unusual problems presented by these cases and also in his interpretation and application of 18 U.S.C. Sec. 3553 and the Sentencing Guidelines.
 
 
 24
 First, he determined that there was not an applicable sentencing guideline and then correctly turned to 18 U.S.C. Sec. 3553(b) for direction. This section provides in part:
 
 
 25
 In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.
 
 
 26
 This section sets forth the factors to be considered by the court in imposing the sentence and provides that the court
 
 
 27
 shall consider
 
 
 28
 (2) the need for the sentence imposed
 
 
 29
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 
 
 30
 (B) to afford adequate deterrence to criminal conduct;
 
 
 31
 (C) to protect the public from further crimes of the defendant; and
 
 
 32
 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
 
 
 33
 The court then found that the defendants' offenses involved four counts of involuntary manslaughter as covered by Sec. 2A1.4 of the Sentencing Guidelines and a base offense level of 14 "because the conduct was reckless." Section 2A1.4(a)(2). Application Note 1 states:
 
 
 34
 "Reckless" refers to a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation. The term thus includes all, or nearly all, convictions for involuntary manslaughter under 18 U.S.C. Sec. 1112. A homicide resulting from driving, or similarly dangerous actions, while under the influence of alcohol or drugs ordinarily should be treated as reckless.
 
 
 35
 Section 18 U.S.C. Sec. 1112(a) defines "manslaughter" as
 
 
 36
 the unlawful killing of a human being without malice. It is of two kinds:
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 Involuntary--In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.
 
 
 40
 We agree with the district court that involuntary manslaughter covered by Sec. 2A1.4(a)(2) is the most analogous and fits the facts in this case. The actions for which the defendants stand convicted were certainly reckless and resulted in the killing of four human beings. The jury found that J & T's actions amounted to willful violations of the safety regulations, and Williams pled guilty to such willful violations.
 
 
 41
 The district court then found that the counts should not be grouped under Sec. 3D1.2 which provides:
 
 Groups of Closely-Related Counts
 
 42
 All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
 
 
 43
 (a) When counts involve the same victim and the same act or transaction.
 
 
 44
 (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
 
 
 45
 (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
 
 
 46
 (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.
 
 
 47
 * * *
 
 
 48
 * * *
 
 
 49
 Specifically excluded from the operation of this subsection are:
 
 
 50
 all offenses in Chapter Two, Part A....
 
 
 51
 The district court then found that there were four victims so subparagraph (a) did not apply, but it then went on to correctly find that grouping under this section of the guidelines did not apply to involuntary manslaughter because it is an offense covered by Chapter Two, Part A.
 
 
 52
 The district court was correct in its decision that grouping of the counts was not available under the Sentencing Guidelines. Therefore, the offense level of 19 was proper, and the guideline range of $700,000 to $1,400,000 was applicable to J & T, and there was no error in the consecutive sentences given to Williams.
 
 IV.
 
 53
 J & T argues that the district court did not make findings of fact as required by Fed.R.Crim.P. 32 on the disputed issues of J & T's ability to pay the fine, and the alleged intertwining of J & T and JAD, although the court considered JAD's financial resources without a finding that J & T was the alter ego of JAD. The appellant also claims the court failed to make such finding as to J & T's alleged prior criminal conduct. We find no merit to these claims. The record reflects that the district court spent the better part of two days hearing testimony and arguments of counsel on these issues prior to sentencing. A majority of this time was spent in addressing the issues of J & T's ability to pay the fines and the connection between the two corporations owned by Carl McAfee and Paul Dean, and whether the court should pierce the corporate veil of J & T so as to get to the assets of the two stockholders and/or JAD.
 
 The court found:
 
 54
 But it is that fact [J & T's bankruptcy] in and of itself as indicative from the evidence that the court has heard that the decision to place the defendant corporation in bankruptcy was a matter of expediency, not necessarily one that was required but one that was desired.
 
 
 55
 It is clear from financial information that I have reviewed that substantial funds were pumped into this company by JAD when it suited their interest, and they were withheld when it suited JAD's interest, and that the principals of JAD and J & T are substantially the same.
 
 
 56
 That being the case, I do not believe it would be appropriate or required that the corporate veil be pierced. I do not, I do not think that Congress intended for such cumbersome procedures under circumstances such as this to be required.
 
 
 57
 I must make a reasoned decision based upon all the facts in the case that I have heard. I see no basis, given the conclusion that they pumped money in when necessary, they closed it down when necessary, I see no reason for imposing a fine of less than $1.4 million and then reducing that fine, as I am required to do, as indicated.
 
 
 58
 The evidence had shown that J & T had little net worth and few assets. Its meager financial structure, lack of corporate records and its dependence on JAD for almost everything is set forth in Sec. 1. The district court clearly found that J & T could pay the fines if JAD wished it to do so. The court also found that Congress did not intend for district courts to engage in such cumbersome proceedings as piercing a corporate veil before arriving at an appropriate fine or sentence. This is particularly true when a corporation, such as J & T, has been put into bankruptcy in an obvious effort to avoid payment of any fine. The court directed its clerk to immediately notify the United States Trustee in Bankruptcy of its decision and the fine against J & T. If further proceedings are needed to bring in JAD and/or the two owners of J & T and JAD, this can be done by appropriate proceedings in the bankruptcy court or the district court. It could not be done at the sentencing proceeding because neither JAD nor the two individual owners of J & T and JAD were before the court.
 
 
 59
 The findings of the district court were sufficiently specific on the issue of J & T's ability to pay the fine and the connection between J & T and JAD to comply with the Federal Rules of Criminal Procedure.
 
 
 60
 Appellant claims the district court did not make specific findings as to J & T's prior criminal conduct. The district court found that mining companies owned or operated by Mr. Dean and Mr. McAfee had been cited for 1233 mining violations since 1980, and over 400 such violations had involved defendant Garry Williams in his position as superintendent. Sentencing Guideline Sec. 8C2.8(a)(6) provides:
 
 
 61
 (a) In determining the amount of the fine within the applicable guideline range, the court should consider: (6) any prior criminal record of an individual within high-level personnel of the organization or high-level personnel of a unit of the organization who participated in, condoned, or was willfully ignorant of the criminal conduct;
 
 
 62
 Garry Williams, as superintendent of J & T, was a "high-level" person within J & T and his acts, as such, were properly considered in setting the J & T fine. Appellant argues that the court did not specifically find which violations by Williams or by the Dean and McAfee companies were those of J & T. The presentence report found that prior to the fatal accident, J & T had been cited for 88 mining violations.
 
 
 63
 After considering numerous objections to the presentence report, the court inquired of defendant's counsel if there was any other objection to the report that needed to be considered. The defendant made no claim that any additional information as to its prior criminal conduct was necessary. The court had computerized printouts showing the 88 prior mining violations at the sentencing hearing. We find the court's factual findings on this point were sufficient.
 
 
 64
 Therefore, the convictions and sentences of the appellants are
 
 
 65
 AFFIRMED.
 
 
 
 [1]
 The trial court reduced this fine by the amount of the civil fine
 
 
 [2]
 30 United States Code Sec. 820 Penalties
 (a) Civil penalty for violation of mandatory health or safety standards
 The operator of a coal or other mine in which a violation occurs of a mandatory health or safety standard or who violates any other provision of this chapter, shall be assessed a civil penalty by the Secretary which penalty shall not be more than $10,000 for each such violation. Each occurrence of a violation of a mandatory health or safety standard may constitute a separate offense.
 
 
 [3]
 (d) Criminal penalties
 Any operator who willfully violates a mandatory health or safety standard, or knowingly violates or fails or refuses to comply with any order issued under section 814 of this title and section 817 of this title, or any other order incorporated in a final decision issued under this subchapter, except an order incorporated in a decision under subsection (a) of this section or section 815(c) of this title, shall, upon conviction, be punished by a fine of not more than $25,000, or by imprisonment of not more than one year, or by both, except that if the conviction is for a violation committed after the first conviction of such operator under this chapter, punishment shall be by a fine of not more than $50,000 or by imprisonment for not more than five years, or both.